Dicken *vs.* Dicken.

ELLEN D. DICKEN, plaintiff in error, *vs.* H. T. DICKEN, defendant in error.

1. On the hearing of a motion for temporary alimony, pending an action for divorce, the merits of the cause are not in issue. But, under section 1735 of the Code, the Judge, fixing the amount of alimony, *may* inquire into the cause and circumstances of the separation, rending the alimony necessary, and, in his discretion, may refuse it altogether; or he may grant such alimony, including the expenses of the litigation, as the condition of the husband, and the *facts* of the case may justify. But the Judge should exercise a sound discretion, and should be careful that he does not so use this discretionary power, as to encourage the separation of husbands and wives, and increase litigation of this character.

2. After looking into the cause and circumstances of this separation, we are satisfied the Judge did not abuse the discretion vested in him by the statute.

Divorce. Alimony. Decided by Judge GREEN. Spalding Superior Court. February Term, 1869.

Mrs. Dicken sued her said husband for divorce upon the ground of cruel treatment. The charge was, that on the 27th of August, 1868, he "layed violent hands upon" her and "cruelly treated and violently used her without any cause whatever;" that on said day, and other days, he "did resort to all kinds of means and devices to harrass, alarm and punish" her "using, at various times, violent threats, and pre-

tending, at other times, to be deranged, and would act, in her presence and about the house, as a lunatic, for the purpose of alarming her." The schedule of his property made by her footed up $5,425 00, besides $1,500 of notes, which she supposed he owned.

He was called on to show cause why temporary alimony and attorney's fees should not be paid by him. At the hearing, an attorney-at-law testified that $100 00 was a reasonable fee for prosecuting this cause, if it is defended; that, supposing defendant to be worth $4,000 00 or $5,000 00, he thought $20 00 to $25 00 per month was quite reasonable for her support, either at the homestead or boarding, perhaps less if she lived in the country; that the house where she lived was worth $2,000 00, and would rent for $250 00 *per annum.*

Another attorney testified that, if this cause was defended, a reasonable attorney's fee for prosecuting it would be from $100 00 to $200 00, considering defendant's pecuniary ability as shown by his return. The clerk testified, that when the libel was filed, Mrs. Dicken's attorneys told him not to issue process at once, but to let it alone for a week or two, with a view of having the cause settled, if possible, without suit.

Here movants closed.

Defendant was then examined in his own behalf. He testified that he married plaintiff in 1838, and that they had lived together peaceably till last summer; that he had been well off, pecuniarily, but lost thirty-five slaves and other property by the war; that during the war he moved to a farm four miles from Griffin; his wife insisted on returning, and he moved back to Griffin, still carrying on the farm; that after the war, he had the farm dwelling plastered and repaired, and moved back; his old slaves consented to stay with him; that he had four cooks, but neither would cook, because his wife was so cross, etc; she insisted that he should sell and return to Griffin, and he did so at a great sacrifice; he sold his farm and stock, etc., for $4,700 00, putting his land at $2 00 per acre, when in fact it was worth greatly more, and would now sell for $10 00 per acre; they boarded,

and his wife fell out with her landlady; he then bought a house at a high price; he went into the livery business, made money, but was dissatisfied; after a year he sold his livery interests, bought cotton and lost $1,600 00; this embarrassed him and he wished to return to the country; he bought a place in Pike county, but his wife would not go there; he moved there, staid about a week, was dissatisfied, sold out and wished to buy an improved place of Goddard, in Butts county, near a church which he had been serving (as a minister) for nearly eleven years; his wife refused to go; no place in the country would suit her; it cost about $1,500 00 *per annum* to live in Griffin, and he had no income; they separated; he bought the Locust Grove property, but his wife would not go and live with him; he went away from it, and sent her word to go and live there and he would not disturb her, but she would not go.

He was asked if he had ever treated her cruelly. This was objected to, because cruel treatment was the ground of divorce alleged in the libel. The Court overruled the objection. He said he had not, but that on the contrary, after the separation he went to Griffin, found where she boarded and went there, intending to beg her, on his knees, to return to him, but she would not see him. He wrote a letter to her begging her to return, but she refused. He said he had been sick, and nearly lost his mind, that he was unwilling now for her to live with him unless she would respect him as the head of the family, as she had done; that no effort was made to get him to support her before the suit was brought; she lived in his house in Griffin, and he supposed was getting the rent of another house in Griffin, worth, say $12 00 per month; (this estimate was afterwards supported by another witness;) that he had sent her $10 00, and left some provisions and about seventy-five loads of wood for her at home when he left.

A schedule of his property was attached to his answer to the rule. It was as follows: 100 acres land in Henry county, Georgia, $600 00; 2 mules and a wagon, $400 00; 2 cows, $50 00; merchandize in store, $1,500 00; furniture, $60 00; town lot in Griffin, $1,575 00; town lot in Griffin,

$300 00; household furniture, in Griffin, $200 00; 2 notes on Harris, due 25th of December, 1869, $760 00, total; note on Scott, value unknown, $800 00; note on Walker, supposed value, $130 00; account on Thurman, $36 00; buggy and harness, $125 00. Of this property, his wife had possession and control of the lots in Griffin and the household furniture. He showed by schedule also, that he owed $1,959 00.

DR. WOOLSEY testified, that defendant moved to Locust Grove on the 10th of September, 1868, bought some land, and for a time, boarded with him; that defendant was unwell, and for several days quite sick; that he visited him during his illness last summer and found him in a low state of health, and, as the witness thought, partially insane; that he did not examine him professionally, but from observing him, thought him insane or partially so. Defendant went away, stayed ten or twelve days, returned and began merchandizing. Soon he began living at the store, having rations cooked for him and his clerk at the store. Last fall his store and goods were burnt, and he thereby lost, say $2,000 00. He is still merchandizing, but not making more than will support him and his clerk, and he owes $500 00 for the Locust Grove property. He said the house at Locust Grove is a good one for a respectable family, and the community is a respectable one. He testified that he was boarding a school-mistress and a workman, furnishing lights, washing, etc., at $12 00 per month, and he supposed that $5 00 per month was enough for a lady's wardrobe.

DR. SAUNDERS, their family physician, bore testimony that they had lived well and happily together, each performing the marital duties; that she appeared to have control, that Dicken generally did as she said. Her suggestions alluded to by him, were as to the management of the sick. A witness testified that he visited Dicken when he was very sick, that his wife did not speak very affectionately to him, that he called her by affectionate names, but she would not come to him; though she was in another room and possibly did not hear him.

Mrs. Dicken was examined.  So much of her testimony as is important was as follows: Dicken coming home, in the latter part of last summer, complained of the extravagant living and spoke of buying an unimproved place in Butts county, Georgia, and wished her to go there and live; she remonstrated, saying, that with their limited means and his advanced age and feeble health, such a step would be imprudent.  He then insisted upon her discharging the servants and doing the cooking in person; she replied she would not do the cooking for him to save his life.  (She said his conduct and talk provoked her to this improper remark.)  He continued talking and became excited; she went into the back yard and then into the front yard; he ordered her back into the house; she would not go, and he said, with an oath, she should; he started toward her in a violent manner; she passed out of the gate on to the sidewalk, when he seized her by the hands, crossed them, and dragged and forced her into the yard, thence into the piazza, thence into her room, shoved her into a chair, took hold of her shoulder, and, with an oath, told her to behave herself; some ladies came in and he said to them that his wife had been living out of the church so long that she was backslidden and excited about it; then she replied that he knew that was not the cause of her screaming, and he replied that that was a lie, or an infernal lie; once before that, he raised a saucer at the table and was about throwing it at her, when she told him he had better not, and he desisted; when he returned from Butts county he found her in bed sick, asked her who was her physician, she told him; he sat awhile and then remarked that he had as soon be in hell as there.  She said that, for eight or ten months before their separation, his conduct was terrifying, and she was afraid to live with him.  She said she wished to move back from Butts county to Griffin because the house was bad, the neighbors were few, and her husband, having charge of four churches, was much from home.  She was satisfied after the house had been repaired, and did not insist on moving, but her husband sold out because his old servants would not stay with him; he spoke of having struck at a

negro with a trace chain, and said had he hit him, he might have killed him, and that he would farm no longer. When asked to go to the Pike place, she said she thought she deserved a better house; he insisting upon her going, she said her daughter's situation would not allow her to go, and he appeared satisfied; he stayed but about a week in Pike, and then sold that place; that was before his health and mind appeared to be impaired; about two months after he had attempted to kill himself, the difficulty occurred which caused the separation; she thought him then in his right mind; she did not think him insane last summer, though some of his friends did; he took a good deal of laudanum and whiskey; she always treated him kindly, and would not have left him had it been possible to live with him; she said she inherited four or five slaves and some money, which went into their common stock, and she had assisted in accumulating what they had; she thought she needed $30 00 per month to live; said she had had no money but $12 00, collected for rent, $18 00 for wood sold, and $10 00 sent to her by him; her son-in-law, by Dicken's consent, was living with her in Dicken's house; she was told that he would let her live with him if she would treat every one who came, and negroes, kindly; and she understood this to mean that she should receive negroes as equals; she said her health was not good; that she had no income except from her labor, and sometimes needed a physician. She said further, that she would not now live with him, because she was satisfied he wished to be rid of her.

One of her attorneys testified that, after the libel was filed, but before he was served, Dicken was asked to make provisions for his wife's support, and he refused.

The testimony being closed, and argument had, the Judge ordered Dicken to pay his wife's attorneys $50 00, as a fee, and that she be allowed to remain in his said house pending this action. Her attorneys say the allowance, for a fee, was too small, and the refusal of other alimony than the occupancy of the house, was wrong, and that the Court also erred in hearing Dicken's testimony as to cruel treatment of his wife.

Dicken *vs.* Dicken.

BOYNTON & DISMUKE, for plaintiff in error.

D. J. BAILEY, for defendant in error.

BROWN, C. J.

It is not the purpose of this Court to enter into a discussion of the merits of the unfortunate difficulties which have resulted in the separation of the parties to this record. Doubtless the heavy losses which they sustained by the war, had much to do in producing the state of mental disquietude and irritability which led to the separation. From the possession of what, in the section of country where they lived, might be termed wealth, they were reduced in their estate, till they must labor in their old age for a living, much less comfortable than they formerly enjoyed without the necessity of daily toil. Struggling with these misfortunes, Mr. Dicken found his wife unwilling to accommodate herself to their changed condition and to live in the country, in the simple style which he felt obliged to adopt. This, with his losses resulting from unfortunate trading since the war, had affected his mind very seriously; and it would seem, from the testimony of the witness, and the irregularities of his conduct, so much in conflict with his Christian character, that it must, at times, have produced temporary insanity. In this unfortunate condition of the family, the record does not show that the wife conducted herself with that gentle forbearance, or that she displayed that sympathy and kindness so characteristic of her sex, in times of misfortune and distress. Had her course been different towards her husband in his periods of gloomy depression, the necessity for this proceeding might probably never have existed.

1. But it is insisted by the learned counsel for Mrs. Dicken, that the Court had no right to inquire into the causes of the separation, in a motion for temporary alimony—that the proof of the marriage and the pendency of the action for divorce entitled her to it, as matter of right. We admit that some of the former decisions of this Court, go far to sustain this

view of the case.  But we think the rule, if it had been so established by the Court, has been changed by the Code, and that the change was a proper one.  The legislature has certainly gone quite as far as sound public policy authorizes, (it might not be proper for the Court to say, further than the New Testament justifies,) in the enactment of laws facilitating the separation of husband and wife by divorce.  If the Courts encourage those separations, by a liberal grant of temporary alimony, when the wife, as plaintiff, is decidedly at fault, the evil will be greatly increased.

It follows, therefore, in our opinion, that the legislature acted wisely in giving the Judge the power, in his discretion, to inquire into the cause and circumstances of the separation, in fixing the amount of alimony, and in authorizing him, in proper cases, to refuse it altogether.  When the wife has, in fact, been wronged, and she comes into Court with a just cause of action, every facility should be afforded her, to litigate upon terms of perfect equality with her husband, and the Judge should so shape his orders as to give her the means to do so, with a comfortable support, according to her *status* in society, and her husband's ability, pending the litigation.  But the Judge should not be bound to give alimony to encourage such litigation, in every case where an imprudent, high-tempered, or even criminal wife chooses to commence proceedings of this character against her husband.  He is not bound to inquire into the cause and circumstances of the separation.  The statue says he *may* do it.  And as he is to exercise a sound discretion in determining on the amount of alimony to which the wife is entitled, or whether she is entitled to any, there seems to be good reason why he should make the inquiry in a large proportion of the cases of this character, which come before him.

But it was insisted that the Judge allowed a less sum for counsel fees, in this case, than was proven to be the *minimum* fee, for the prosecution of such a case, and that his judgment was, therefore, contrary to the evidence and should be set aside.  If the Judge had the right, after the hearing of the case, to refuse anything for alimony or counsel fees, we do not

Dicken *vs.* Dicken.

see why he had not the right to allow a less amount than the proof shows the services of the counsel to be worth.

2. The whole question is one of sound discretion. Under all the facts and circumstances of this case, did the Judge abuse the discretion vested in him by the statute, to such an extent as to make it the duty of this Court to interfere, and set aside the judgment. We think not.

It is claimed that there is some ambiguity in the order which leaves it doubtful, whether Mrs. Dicken is to have the use and control of the house in Griffin, where she lives, which one of her witnesses testifies, will rent for $250 00 *per annum,* as her alimony, or whether she has only the right to occupy a room in the house. We construe the judgment to mean that she is to have the use and control of the house, with the right to receive the rents during the litigation, and we have so shaped our judgment as to make that certain, if it were not so already.

Judgment affirmed.